## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>KEYSIGHT TECHNOLOGIES, INC.<br><br>and<br><br>SPIRENT COMMUNICATIONS PLC,<br><br>*Defendants*. | Civil Action No. _____ |

## COMPETITIVE IMPACT STATEMENT

In accordance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h) (the "APPA" or "Tunney Act"), the United States of America files this Competitive Impact Statement related to the proposed Final Judgment filed in this civil antitrust proceeding.

## I.    NATURE AND PURPOSE OF THE PROCEEDING

On March 28, 2024, Keysight Technologies Inc. ("Keysight") offered to acquire Spirent Communications plc ("Spirent") for approximately $1.5 billion, and Spirent's shareholders voted to accept this offer on May 22, 2024. The United States filed a civil antitrust Complaint on June 2, 2025, seeking to enjoin the proposed acquisition. The Complaint alleges that the likely effect of this acquisition would be to substantially lessen competition for the development, manufacture, and sale of three key types of communications testing and measurement equipment—high-speed ethernet testing equipment, network security testing equipment, and

radiofrequency ("RF") channel emulators—to customers in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

At the same time the Complaint was filed, the United States filed a proposed Final Judgment and an Asset Preservation and Hold Separate Stipulation and Order ("Stipulation and Order"), which are designed to remedy the loss of competition alleged in the Complaint.

Under the proposed Final Judgment, which is explained more fully below, Defendants are required to divest the identified Divestiture Assets in each of the three Divestiture Businesses where competitive harm is alleged. The Divestiture Businesses are high-speed ethernet testing, network security testing, and RF channel emulators, as detailed in the proposed Final Judgment. These assets must be divested to a third-party acquirer approved by the United States. Viavi Solutions, Inc. has already entered into an agreement with Defendants to acquire the Divestiture Assets and is an approved acquirer, and divestiture could also be made to an alternative acquirer if approved by the United States.

The Stipulation and Order requires Defendants to take certain steps to preserve competition and to ensure the competitiveness of the Divestiture Assets pending entry of final judgment by this Court. Specifically, Defendants must operate, preserve, and maintain the Divestiture Assets as ongoing, economically fully viable, marketable, and competitive assets until the required divestiture is complete. In addition, management, sales, and operations of Divestiture Assets must be held entirely separate, distinct, and apart from Defendants' other operations. The Stipulation and Order also provides firewalls to ensure Keysight cannot access competitively sensitive information from the Divestiture Businesses.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment will terminate

this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.    DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.    The Defendants and the Proposed Transaction

Keysight is a Delaware corporation headquartered in Santa Rosa, California. It is a leading provider of communications testing and measurement equipment in the U.S. and worldwide. Keysight's fiscal year 2024 global revenues were approximately $4.979 billion, $1.769 billion of which were from the United States. Keysight's Communications Solutions Group produces and sells the products in the relevant markets at issue. The Communications Solutions Group includes two main areas: (i) commercial communications and (ii) aerospace, defense and government.

Spirent is a United Kingdom corporation headquartered in Crawley, England, with offices in Calabasas, California and other locations in and outside the United States. It is also a leading provider of communications testing and measurement equipment in the U.S. and worldwide. Spirent earned $460 million in global revenues in 2024, $257 million of which were from the United States.

On March 28, 2024, Keysight offered to purchase Spirent for $1.5 billion. Spirent's board recommended that Spirent shareholders accept Keysight's offer, which they did on May 22, 2024.

### B.    The Competitive Effects of the Transaction

Keysight and Spirent provide critical, highly-specialized equipment used to test various components of communications networks and measure and validate network performance. Together, they dominate three key communications testing and measurement markets in the

United States: high-speed ethernet testing, network security testing, and RF channel emulators. Keysight and Spirent are each other's closest competitors in these markets. For years, competition between them has resulted in each company offering discounts, maintaining valuable aftermarket support services, and investing in new and advanced products and features—all to the benefit of their customers and the broader public. Keysight's proposed acquisition of Spirent would eliminate this competition, leading to higher prices; lower quality products, support, and service; and less innovation.

### 1.    Industry Overview

Communications networks connect the world, moving significant volumes of data around the clock. The communications industry uses specialized testing equipment to verify the performance of communications networks and the devices connected to them. This testing is essential to validate that a network performs as expected, even under non-ideal conditions, such as conditions that interfere with a wireless signal, or to ensure that networks and equipment can handle increasing loads of traffic. Testing also helps ensure that user data is securely protected against the threat of cyberattack. To complete this testing, equipment manufacturers and network operators purchase specialized hardware and software equipment, and they rely on periodic software updates and multi-year services contracts to provide regular maintenance and system upgrades.

Network equipment manufacturers, communications network operators, and large cloud computing providers purchase and use this specialized testing equipment to ensure their products and networks operate effectively and securely under normal conditions, and to prepare them to withstand the real-world strain of interruptions, cyberattacks, interference, and high user demand. Because communications technologies are rapidly evolving, the communications

industry invests millions of dollars annually in researching, developing, and implementing upgrades to their products to keep pace with technological advancement.

Customers use lab testing equipment throughout the lifecycle of a network, even after the network or devices in it have been deployed. Lab testing ensures that communications networks can support updated devices, comply with revised industry standards, and maintain data security as the cybersecurity landscape changes.

Lab testing equipment requires constant engineering investment. Network technology changes rapidly: data moves faster, mobile wireless providers deploy new spectrum and new wireless technologies, would-be hackers develop new lines of attack, and device manufacturers make each iteration of their product more sophisticated. Lab testing equipment providers, including Keysight and Spirent, spend millions of dollars each year on research and development to ensure their products keep pace with market changes and employ hundreds of specialized experts dedicated to improving their testing equipment and responding to customer requests.

Accurate lab testing capabilities are critical to the development, validation, and maintenance of wireline and wireless communications devices and networks. A wide range of customers depend on specialized lab testing equipment to successfully deploy their networks and devices, including network equipment manufacturers, network operators, chipset manufacturers, "hyperscalers" that offer cloud computing services, research labs, government testing centers, and large companies operating secure internal networks. Equipment cannot be effectively deployed in these complex networks without such testing.

### 2.    Relevant Markets Affected by the Proposed Acquisition

The Complaint alleges likely harm to competition in three distinct product markets within the communications testing and measurement industry: (1) high-speed ethernet testing; (2) network security testing; and (3) radiofrequency ("RF") channel emulation.

### a.    High-speed ethernet testing

High-speed ethernet testing equipment tests the performance of both the hardware and software components of high-speed wireline communications networks. Specifically, it tests the functionality of communications both within a given network and across different networks. This testing ensures that wireline networks can support high-bandwidth use cases, such as running artificial intelligence algorithms. These testing products are crucial to ensure that large network operators can support data usage at scale.

Customers using high-speed ethernet testing equipment have no reasonable alternatives for testing their wireline network equipment. Solutions developed in-house or relying on open-source software would not provide an adequate alternative for most customers. Attempting to use such options would require costly investments in engineering and other technical resources, can take years to develop, and would not be as reliable or robust as the high-speed ethernet testing equipment available from Keysight or Spirent. A hypothetical monopolist could profitably impose a small but significant and non-transitory price increase for, or otherwise degrade quality of, high-speed ethernet testing equipment sold to customers in the United States. A degradation of quality could entail any dimension of competition, including service, capacity investment, choice of product variety or features, or innovation. Accordingly, high-speed ethernet testing equipment sold to U.S. customers constitutes a relevant market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### b.     Network security testing

Network security testing equipment assesses the cybersecurity of wireline networks through laboratory simulation of attacks, testing firewalls as well as other security-related features like proxy and secure content gateways. These products simulate real-world conditions, such as high traffic volumes, to ensure that a network's security policies protect it from attack without impacting performance.

Customers that purchase network security testing equipment have no reasonable alternatives. Although some companies make use of open-source software or internally developed tools for limited purposes, self-supply is not a viable option for most customers due to the high costs involved. Customers rely on network security testing equipment to ensure sensitive data are protected from cyberattacks and are thus unlikely to rely on unproven and untested solutions in the ordinary course of business. A hypothetical monopolist could profitably impose a small but significant and non-transitory price increase for, or otherwise degrade quality of, network security testing equipment sold to customers in the United States. A quality degradation could entail any dimension of competition, including service, capacity investment, choice of product variety or features, or innovation. Accordingly, network security testing equipment sold to U.S. customers constitutes a relevant market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### c.     RF channel emulation

RF channel emulators evaluate how wireless networks and devices will react when deployed in the real world, where a wireless signal may not be perfect. Wireless networks transmit data using radio frequency spectrum. Wireless communication networks are used across multiple important industries, including cellular networks, satellite networks, and radar and

navigation systems. Unlike in a wireline environment, signal transmission through radio frequency can be subject to substantial interference from weather, large objects, topographical features, and the presence of other competing radio signals. RF channel emulators, also known as "faders," are used in a lab setting. They test whether wireless receivers, such as cell phones or radar handsets, can effectively receive and decode RF signals. A channel emulator adds various impairments to the intended communication path to simulate real-world challenges, such as dense urban settings, mountainous regions, or long distances. This performance testing enables engineers to adjust and optimize designs in a controlled environment to ensure wireless networks perform as expected once they are deployed.

Customers that purchase RF channel emulators have no reasonable competitive alternatives. Although some companies make use of open-source software or internally developed tools for limited purposes, self-supply is not a viable option for most customers due to the high costs and technical expertise required to develop internal solutions. Customers rely on RF channel emulators to ensure networks will operate effectively in real-world conditions. A hypothetical monopolist could profitably impose a small but significant and non-transitory price increase for, or otherwise degrade quality of, RF channel emulators sold to customers in the United States. A degradation of quality could entail any dimension of competition, including quality, service, capacity investment, choice of product variety or features, or innovation. Accordingly, RF channel emulators sold to U.S. customers constitutes a relevant market and line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### 3.    Anticompetitive Effects

Keysight and Spirent are the dominant providers of high-speed ethernet testing equipment, network security testing equipment, and RF channel emulators in the United States.

Their proposed merger would extinguish the competition between them and would presumptively result in a substantial lessening of competition in each market.

### a.    High-speed ethernet testing

The transaction would substantially lessen competition in the market for high-speed ethernet testing equipment in the United States. Keysight and Spirent are the two principal suppliers of high-speed ethernet testing equipment in the United States and have remained the market leaders in this area for many years. In the United States, Keysight and Spirent have a combined market share of approximately 85%. The market for high-speed ethernet testing equipment is already highly concentrated and would become significantly more concentrated as a result of the proposed merger.

Keysight and Spirent compete directly against one another to provide high-speed ethernet testing equipment to customers. The handful of other market participants serve far fewer customers and offer much less robust solutions than Defendants do. Customers have benefited from competition between Defendants through lower prices, higher quality services, and more robust innovation – an essential feature as technology and network hardware testing components continuously evolve to meet and enable customer innovations.

### b.    Network security testing

The transaction also would substantially lessen competition in the market for network security testing equipment. Keysight and Spirent are the two largest suppliers of network security testing equipment in the United States and have remained the market leaders for many years. In this market, each Defendant earns more than double the revenue of any other competitor; together, Keysight and Spirent would have a combined market share of at least 60% in the

United States. The market for network security testing equipment is already highly concentrated and would become significantly more concentrated after the proposed merger.

Keysight and Spirent compete head-to-head to provide network security testing equipment to customers. This competition has resulted in lower prices, higher-quality services, and faster product improvements. These updates are essential to keep pace as cybersecurity attackers develop increasingly more sophisticated methods of accessing secure networks.

c.    **RF channel emulation**

The transaction also would substantially lessen competition in the market for RF channel emulators in the United States. Keysight and Spirent are two of the leading providers of RF channel emulators in the United States, with a combined market share of more than 50%. The market for RF channel emulators is already highly concentrated and would become significantly more concentrated after the proposed merger.

Keysight and Spirent compete head-to-head to provide RF channel emulators to customers. This competition has resulted in lower prices, higher-quality services, and faster product improvements. These updates are essential to keep pace as technology improves and wireless networks are used for increasingly more data traffic.

Keysight and Spirent are especially close competitors for customers who use RF channel emulators to test terrestrial wireless networks (as opposed to satellite networks) and for customers who need "external" hardware-based faders able to test a full array of RF channel emulation capabilities. Other providers of RF channel emulators only support satellite networks and/or only emulate simple interference with "internal" software-based products. Keysight and Spirent are the only providers in the United States of RF channel emulators capable of

supporting the full array of test environments for terrestrial wireless networks. For U.S. customers that require these capabilities, Keysight and Spirent are their only options.

### 4.    Barriers to Entry and Expansion

It is unlikely that any firm would enter the relevant markets in a timely manner sufficient to prevent the proposed transaction's anticompetitive effects. Successful entry into these specialized markets is difficult, time-consuming, and costly.

A prospective entrant would need to invest significant time and capital to design and develop testing products comparable to the Defendants' product lines. In each of the relevant markets, Keysight and Spirent have spent millions of dollars and many years acquiring, building, and refining their products. Moreover, the underlying communications technologies are governed by evolving standards, requiring substantial ongoing investment to ensure that a new product functions effectively with new features and meets new standards. Finally, given that these products impact the performance, security, and reliability of networks that handle sensitive data, a prospective entrant would need to devote significant resources to demonstrate its ability to provide a high-quality product and high-quality service and support, including regular updates. Purchasers of high-speed ethernet lab testing equipment, network security testing equipment, and RF channel emulators have complex needs and are reluctant to rely on any company without an established brand and reputation.

### 5.    Absence of Efficiencies

Defendants cannot demonstrate verifiable, merger-specific efficiencies sufficient to offset the proposed merger's anticompetitive effects.

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

Paragraph IV.A of the proposed Final Judgment requires Defendants, within ten (10) calendar days after the Court's entry of the Asset Preservation and Hold Separate Stipulation and Order, or within ten (10) calendar days after Regulatory Approvals (as defined in Paragraph II.G of the proposed Final Judgment) are received, whichever is later, to divest all rights, title and interests in and to all property and assets (collectively, the "Divestiture Assets") related to or used in connection with (i) Spirent's high-speed ethernet testing business, (ii) Spirent's network security testing business, and (iii) Spirent's RF channel emulation business (collectively, the "Divestiture Businesses") to Viavi Solutions, Inc. or another acquirer approved by the United States in its sole discretion. Defendants must take all reasonable steps necessary to accomplish the divestiture quickly and must cooperate with the acquirer.

The proposed Final Judgment identifies fourteen categories of Divestiture Assets in Paragraph II.B required to be divested, including: 1) real property interests at several specified locations used in the Divestiture Businesses, in Calabasas, California; Bucharest, Romania; Honolulu, Hawaii; Beijing, China; and Bangalore, India; 2) all inventory; 3) all tangible personal property; 4) all contracts, contractual rights and customer relationships as discussed in more detail below, and with certain specified exceptions; 5) all licenses, permits, certifications, approvals, consents, registrations, waivers, and authorizations; 6) data and information held or controlled by Defendants; 7) all books and records, with certain specified exceptions pertaining to the organization, existence or capitalization of Spirent or its affiliates; 8) copies of all tax returns related to taxes on or with respect to the Divestiture Businesses or Divestiture Assets; 9) all intellectual property owned, licensed or sublicensed, including patents, copyrights, trademarks, and rights in internet web sites and internet domain names, with certain specified

exceptions related to Spirent's own name and device; 10) tangible and electronic embodiments of know-how, documentation of ideas, research and development files, laboratory notebooks and similar materials, or proprietary software; 11) legal causes of action, judgments, claims, and other rights and privileges against third parties, except tax refund claims; 12) goodwill arising out of the Divestiture Businesses; 13) guaranties, warranties, indemnities and similar rights granted by any third party regarding the Divestiture Businesses or a Divestiture Asset to the extent required to be performed during the period on or after the divestiture date; and 14) originals of all personal records related to Relevant Personnel (as defined in Paragraph II.H of the proposed Final Judgment). These Divestiture Assets are broadly defined to ensure a complete divestiture of all assets needed for the Divested Businesses, while any exceptions to the divestiture obligations are specified in the proposed Final Judgment. Except as otherwise specifically addressed in the definition of Divestiture Assets, only the portion of Shared Assets (ones that relate to, are used in the operation of, or contain information for, both the Divestiture Businesses and other businesses to be retained by Defendants) related to or necessary to the operation of the Divestiture Businesses constitutes Divestiture Assets. The United States, in its sole discretion, will determine whether any Shared Asset is necessary for the operation of a Divestiture Business. Certain shared contracts may relate to both Divestiture Businesses and to businesses not included in the Divestiture Assets, and if so, only the portion of the contract related to the Divestiture Business is considered a Divestiture Asset under Paragraph II.B.4 of the proposed Final Judgment.

Paragraph IV.I of the proposed Final Judgment requires Defendants to identify all Relevant Personnel to the acquirer and the United States, including by providing the acquirer and the United States with organization charts and information relating to these employees and

making them available for interviews. It also provides that Defendants must not interfere with any negotiations by the acquirer to hire these employees. In addition, for employees who elect employment with the acquirer, Defendants must waive all non-compete and non-disclosure agreements, vest all unvested pension and other equity rights, provide any pay pro rata, provide all compensation and benefits that those employees have fully or partially accrued, and provide all other benefits that the employees would generally be provided had those employees continued employment with Defendants, including but not limited to any retention bonuses or payments. This paragraph further provides that Defendants may not solicit to hire any of those employees who were hired by the acquirer, unless an employee is terminated or laid off by the acquirer or the acquirer agrees in writing that Defendants may solicit to hire that individual. The non-solicitation period in the proposed Final Judgment runs for twelve (12) months from the date of the divestiture, but Defendants and the acquirer can negotiate a longer period by private contract.

Paragraph IV.B of the proposed Final Judgment requires Defendants to transfer all contracts, agreements, and relationships to the acquirer and must make best efforts to assign or otherwise transfer contracts or agreements that require the consent of another party before assignment or other transfer.

The proposed Final Judgment requires Defendants to provide certain transition services to maintain the viability and competitiveness of the Divestiture Assets during the transition to the acquirer. Paragraph IV.L of the proposed Final Judgment requires Defendants, at the acquirer's option, to enter into transition services agreements (i) for a period of up to ninety (90) calendar days, for cross-docking and warehousing support, access to Divestiture Assets in Defendants' facilities, marketing, information technology services, human resources, accounting, payroll, accounts payable, accounts receivable, and revenue recognition, and export control, and (ii) for a

period of up to twelve (12) months, for customer service and support. The acquirer may terminate the transition services agreement, or any portion of it, without cost or penalty at any time upon thirty (30) calendar days' written notice to Defendants. The paragraph further provides that the United States, in its sole discretion, may approve one or more extensions of this transition services agreement for a total of up to an additional ninety (90) days and that any amendments to or modifications of any provisions of a transition services agreement are subject to approval by the United States in its sole discretion. Paragraph IV.L also provides that employees of Defendants tasked with supporting this agreement must not share any competitively sensitive information of the acquirer with any other employee of Defendants, unless such sharing is for the sole purpose of providing transition services to the acquirer.

If Defendants do not accomplish the divestiture within the period prescribed in Paragraph IV.A of the proposed Final Judgment, Section V of the proposed Final Judgment provides that the Court will appoint a divestiture trustee selected by the United States to effect the divestiture. If a divestiture trustee is appointed, the proposed Final Judgment provides that Defendants must pay all costs and expenses of the trustee. The divestiture trustee's commission must be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestiture is accomplished. After the divestiture trustee's appointment becomes effective, the trustee must provide monthly reports to the United States setting forth his or her efforts to accomplish the divestiture. If the divestiture has not been accomplished within one hundred and eighty (180) days of the divestiture trustee's appointment, the United States may make recommendations to the Court, which will enter such orders as appropriate, in order to carry out the purpose of the Final Judgment, including by extending the trust or the term of the divestiture trustee's appointment.

Paragraph XV.A of the proposed Final Judgment provides that, if at any time during the five (5) year period following entry of the Final Judgment, the United States determines at its sole discretion that the Final Judgment has failed to fully redress the violations alleged in the Complaint, then the United States may re-open the proceeding to seek additional relief, including divestiture of additional assets.

Paragraph XV.B of the proposed Final Judgment provides that the United States retains and reserves all rights to enforce the Final Judgment, including the right to seek an order of contempt from the Court. Under the terms of this paragraph, Defendants have agreed that in any civil contempt action, any motion to show cause, or any similar action brought by the United States regarding an alleged violation of the Final Judgment, the United States may establish the violation and the appropriateness of any remedy by a preponderance of the evidence and that Defendants have waived any argument that a different standard of proof should apply. This provision aligns the standard for compliance with the Final Judgment with the standard of proof that applies to the underlying offense that the Final Judgment addresses.

Paragraph XV.C of the proposed Final Judgment provides additional clarification regarding the interpretation of the provisions of the proposed Final Judgment. The proposed Final Judgment is intended to remedy the loss of competition the United States alleges would otherwise be harmed by the transaction. Defendants agree that they will abide by the proposed Final Judgment and that they may be held in contempt of the Court for failing to comply with any provision of the proposed Final Judgment that is stated specifically and in reasonable detail, as interpreted in light of this procompetitive purpose.

Paragraph XV.D of the proposed Final Judgment provides that if the Court finds in an enforcement proceeding that a Defendant has violated the Final Judgment, the United States may

16

apply to the Court for an extension of the Final Judgment, together with such other relief as may be appropriate. In addition, to compensate American taxpayers for any costs associated with investigating and enforcing violations of the Final Judgment, Paragraph XV.D provides that, in any successful effort by the United States to enforce the Final Judgment against a Defendant, whether litigated or resolved before litigation, the Defendant must reimburse the United States for attorneys' fees, experts' fees, and other costs incurred in connection with that effort to enforce this Final Judgment, including the investigation of the potential violation.

Paragraph XV.E of the proposed Final Judgment states that the United States may file an action against a Defendant for violating the Final Judgment for up to four (4) years after the Final Judgment has expired or been terminated. This provision is meant to address circumstances such as when evidence that a violation of the Final Judgment occurred during the term of the Final Judgment is not discovered until after the Final Judgment has expired or been terminated or when there is not sufficient time for the United States to complete an investigation of an alleged violation until after the Final Judgment has expired or been terminated. This provision, therefore, makes clear that, for four (4) years after the Final Judgment has expired or been terminated, the United States may still challenge a violation that occurred during the term of the Final Judgment.

Finally, Section XVI of the proposed Final Judgment provides that the Final Judgment will expire ten (10) years from the date of its entry, except that after five (5) years from the date of its entry, the Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestiture has been completed and continuation of the Final Judgment is no longer necessary or in the public interest.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE PLAINTIFFS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment neither impairs nor assists the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against Defendants.

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or within sixty (60) days of the first date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the U.S. Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time before the Court's entry of the Final Judgment. The comments and the response of the United States will be filed with the Court. In addition, the comments and the United States' responses will be published in the

*Federal Register* unless the Court agrees that the United States instead may publish them on the U.S. Department of Justice, Antitrust Division's internet website.

Written comments should be submitted in English to:

> Jared Hughes
> Assistant Chief
> Media, Entertainment and Communications Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street NW, Suite 7000
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

As an alternative to the proposed Final Judgment, the United States considered a full trial on the merits against Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Keysight's acquisition of Spirent. Under the circumstances present here, however, the United States concludes that entry of the proposed Final Judgment is in the public interest insofar as it avoids the time, expense, and uncertainty of a full trial on the merits.

## VII.    STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a sixty (60) day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public

interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the

statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged
> violations, provisions for enforcement and modification, duration of relief sought,
> anticipated effects of alternative remedies actually considered, whether its terms
> are ambiguous, and any other competitive considerations bearing upon the
> adequacy of such judgment that the court deems necessary to a determination of
> whether the consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant
> market or markets, upon the public generally and individuals alleging specific
> injury from the violations set forth in the complaint including consideration of the
> public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75

(D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements);

*United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C.

Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only

inquires "into whether the government's determination that the proposed remedies will cure the

antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to

enforce the final judgment are clear and manageable").

       As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the

APPA a court considers, among other things, the relationship between the remedy secured and

the specific allegations in the government's Complaint, whether the proposed Final Judgment is

sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may

positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of

the relief secured by the proposed Final Judgment, a court may not "make de novo determination

of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993)

(quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*,

152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16

(D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of

competing social and political interests affected by a proposed antitrust decree must be left, in

the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577

(quotation marks omitted). "The court should also bear in mind the *flexibility* of the public

interest inquiry: the court's function is not to determine whether the resulting array of rights and

liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement

is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at 1460 (quotation marks

omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL

1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous

practical consequences for the government's ability to negotiate future settlements," contrary to

congressional intent. *Microsoft*, 56 F.3d at 1456. "The Tunney Act was not intended to create a

disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded

deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give

"due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron*

*Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to

settlement agreements under the Tunney Act, a court must be mindful that [t]he government

need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need

only provide a factual basis for concluding that the settlements are reasonably adequate remedies

for the alleged harms." (internal citations omitted)); *United States v. Republic Servs., Inc.*, 723 F.

Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section

shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).

## VIII.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: June 2, 2025

<div style="margin-left:45%">

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:

/s/ Carl Willner
Carl Willner (D.C. Bar #412841)
Carmel Arikat (D.C. Bar #1018208)
Curtis Strong (D.C. Bar #1005093)
U.S. Department of Justice
Antitrust Division
Media, Entertainment, and Communications
Section
450 Fifth Street NW, Suite 7000
Washington, DC 20530
Telephone: 202-514-5813

</div>